UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COUNTY OF FRESNO,<br><br>    Plaintiff,<br><br>    v.<br><br>ALEX AZAR II, Secretary of the Department of Health and Human Services,<br><br>    Defendant. | 1:18-cv-00320-LJO-BAM<br><br>**MEMORANDUM DECISION AND ORDER RE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT**<br><br>**(Docs. 25, 26)** |

## I. <u>INTRODUCTION</u>

The County of Fresno (the "County") filed this action in March 2018 challenging a final decision of the Secretary of Health and Human Services (the "Secretary" or "HHS"), acting through the Departmental Appeals Board ("Appeals Board"), disallowing certain pension obligation bond costs incurred by the County in performing services that benefit federally funded programs. The parties filed cross-motions for summary judgment; upon completion of the parties' briefing, the matter was taken under submission, and the hearing on the parties' motions was vacated. For the reasons set forth below, the Secretary's motion for summary judgment is GRANTED, and the County's motion for summary judgment is DENIED.

## II. <u>BACKGROUND</u>[1]

**A.    Federal Grant Costs and OMB Circular A-87**

Local governmental entities, including the County, perform a range of tasks that support programs funded by the Federal Government, such as food and nutrition services, adult and children's health and human services programs, housing and urban development programs, and justice service programs. The costs incurred by the County for work performed by its employees on these federal programs are reimbursable through the Federal Government. The principles for determining allowable costs of programs under grants from the Federal Government were originally set forth in a circular issued by the United States Bureau of the Budget, "Budget Bureau Circular A-87." In 1981, the Office of Budget Management ("OMB") reissued the circular as "OMB Circular A-87" (Circular A-87") which is currently codified at 2 C.F.R. Part 200.[2] Under Circular A-87, a single federal agency is designated as a "cognizant agency" and bears responsibility for reviewing, negotiating, and approving cost allocation plans of individual non-federal entities who receive federal grant funding. 2 C.F.R. § 200.19; 2 C.F.R. Part 22, App. V(F)(1) (the "cognizant agency" is generally the federal agency with the largest dollar value of total federal awards with a governmental unit). These plans control the non-federal entity's billing of central service costs, which includes fringe benefit costs of all federal grants received by the non-federal entity. HHS is the cognizant agency for the County's cost allocation plan that is disputed in this case. (AR 112.)

To be allowable under Circular A-87, costs must be necessary and reasonable for the proper and efficient administration of the federal program, be allocable to the Program, and be net of all applicable credits. 2 C.F.R. § 200.403(a) (2016); 2 C.F.R. Part 225, Appx. A(C)(1)(a) (2015).[3] Employee

---

[1] The Background Section is assembled from the parties' briefs and the Administrative Record ("AR") and is meant only to provide the context for the analysis and review of the Appeals Board's decision.

[2] The history of Circular A-87 is set out in *Alabama v. Shalala*, 123 F. Supp. 2d 1250, 1253 (M.D. Ala. 2000).

[3] The relevant sections of Circular A-87 that are applicable to the parties' dispute have been reissued as regulations; in each of the subsequent reorganization of Circular A-87's requirements into different sections of the Code of Federal Regulations, the language of the relevant sections has not changed although minor non-substantive variations in wording exit. (*See* AR 1170.)

compensation, including the cost of fringe benefits such as pensions, is generally an allowable cost, but only to the extent it satisfies the specific requirements of Circular A-87.  2 C.F.R. §§ 200.430, 200.431.  In this case, the parties' dispute centers around the allowability of pension funding costs.

**B.    Underfunded Pension Plans and Catch-Up Payments**

Some non-federal entities, like the County, pay retired former employees a benefit that is set by a defined formula – *i.e.*, defined benefit pensions.  During an employee's career with the employer, he or she accrues a benefit under the plan that will be payable upon retirement; there is often a long period between when an employee accrues a benefit and when the benefit is ultimately paid (at retirement).  To assess the total liabilities of a pension plan at any specific point in time, plan actuaries must project the value of the benefits the plan is obligated to pay in the future.  These actuarial calculations are based on certain known factors such as an employee's years of service to date and predictions of future occurrences such as an employee's retirement date, lifespans, and the rate of return on invested assets.  When the plan liabilities, measured at a particular moment in time, exceed the assets held by the plan at that point, this shortfall is called an unfunded accrued liability ("UAL").

A pension plan may have a UAL for a variety of reasons:  the employer has created a new pension plan that credits an employee for service that pre-dates the plan creation, the employee was awarded additional benefits under an existing plan, the employer failed to deposit sufficient funds in prior years to fund the benefits that accrued in that particular year, there was a lower-than-expected return on plan investments, or assumptions made by actuaries in assessing plan liabilities proved incorrect – *e.g.*, the retirees live longer than expected.  When a UAL occurs, the sponsoring employer generally amortizes the UAL and pays an actuarially-determined amount each year to correct the shortfall over time.  The Governmental Accounting Standards Board ("GASB") issues Generally Accepted Accounting Principles ("GAAP").  To be eligible for reimbursement under Circular A-87, pension costs must be calculated using GAAP.  Under GASB principles, a pension plan's annual required contribution includes costs related to pension benefits accrued in that year *and* payment for any amortized portion of an existing

1  UAL.  (AR 586, GASB No. 27, ¶ 10(f).)  The amortized UAL costs include payment on the UAL and

2  "interest" that is an actuarially-assumed percentage typically corresponding to the actuary's projected rate

3  of investment return on the pension plan assets.  (AR 634, GASB No. 27, ¶ C-5 (defining amortization

4  payment); AR 1029-30, GASB Implementation Guide ¶ 39 (explaining amortization of the UAL).)

5  **C.      Bond Financing for UALs as a Reimbursable Cost under Circular A-87**

6         Circular A-87 contains a specific prohibition on "[c]osts incurred for interest on borrowed

7  capital," unless those costs fall within certain limited exceptions not applicable here.   2 C.F.R.

8  § 200.449(a).[4]  In the 1990s, favorable interest rates incentivized state and local governments to reduce

9  their costs on UALs by selling bonds whose interest rates were lower rate than the actuarial-assumed

10  interest rate for UAL amortization. (AR 27.)  By financing the UAL through bonds, the cost of amortizing

11  the UAL was lowered and the yearly UAL payments were reduced.  The question with respect to these

12  bonds, however, was whether the bond interest paid by the non-federal entity each year would be

13  considered interest on borrowed capital and thus no longer an allowable cost under Circular A-87.  State

14  and local governments argued to HHS and OMB that these bond payments should be allowable because

15  they would save the Federal Government money by reducing the costs associated with pension plans for

16  which reimbursement could be sought.  (AR 27 ("State and local governments argue that, since interest

17  on [UALs] has been allowed by Federal agencies . . . interest on debt issued to fund the [UAL] should be

18  allowable if this financing mechanism reduces costs to the Federal Government.").)

19         In response to HHS' request whether payment on pension bonds could be exempted from Circular

20  A-87's prohibition on interest costs and considered an allowable pension cost, OMB issued a letter from

21  its Chief of Financial Standards and Reporting Branch to provide guidance on this issue: the 1994 OMB

22  guidance letter.  (AR 27-28.)  The 1994 OMB guidance letter states that interest on bonds issued to

23  finance UALs acts as "a surrogate for interest on the underfunded pension liability included in the annual

24

25  _____

[4] Between 1981 and 1995, Circular A-87's interest prohibition was located at Attachment B, Section D.7 (Disallowable Costs).

actuarially-determined pension contribution and, therefore, is allowable under . . . Circular A-87," if the following criteria are met:

1. Debt financing of the [UAL] is not more costly to the Federal Government than regular pension financing over the remaining amortized life of the UAL, considering bond principle, interest, issuance costs, and any other relevant factors, as determined at the time of financing. If this criterion is not met, interest on debt issued to finance the UAL will be allowed only to the extent of the regular pension financing.

2. All net bond proceeds are made part of pension fund assets.

3. The funding for bond principal and interest is (a) included in each period's pension requirement (e.g., annual, biennial, or other), (b) computed in the same manner as the actuary's amortization of the UAL at the time of the conversion to debt financing, and (c) calculated using the weighted average interest rate on the bonds for the period in place of the actuarially-assumed interest rate. The period's pension requirement consists of funding for bond principal and interest applicable to the period and the pension contribution requirement computed by the actuary for normal costs and any UAL not funded by the bonds. Alternatives to (b) and (c) may be used if they do not result in substantially different pension charges.

(AR 28.)

In 1998 the County had a UAL of approximately $300 million (including amortization costs). In reliance on the 1994 OMB guidance letter, the County issued Pension Obligation Bonds ("POBs") to pay the UAL at a reduced interest rate, saving the County nearly $40 million in costs: the aggregate total of the UAL (principal and amortization costs) was $300,145,395; under the 1998 POBs, the aggregate total was $260,559,687. As the 1998 POBs represented a net cost savings, the interest and other associated costs were allowable under the 1994 OMB guidance letter. (*See* AR 32.)

**D.     Repurchase Pension Obligation Bonds:  2003 HHS Division of Cost Allocation ("DCA") Letter**

At some point, payment for pension liabilities began to move toward "refunding POBs"; the County maintains refunding POBs was a well-established practice by 1994.[5]  A refunding POB is

_____

[5] The County cites no support in the record for this proposition.

essentially refinancing an existing POB. In 2002, the County issued refunding/refinanced POBs totaling $117,055,000 to refinance a portion of its 1998 POBs ("2002 POBs"). The 2002 POBs reduced the County's annual POB debt payments for the first seven years and then extended the refinanced portion of the POB debt by an additional ten years. In very simplified terms, instead of making payments on the 1998 POBs from 1999 to 2009, the refunding POBs lowered payments from 2002 through 2008 to interest only, and then raised payments from 2009 through 2018. (*See* AR 32, 2002 Refunding POBs summary). Instead of the $260,559,687 total cost associated with the 1998 POBs, the 2002 refunding POBs cost (principal and interest) a total of $338,208,189. As explained by the County in its brief to the Appeals Board, the 2002 POBs lowered annual expenses to the County by reducing pension obligations for the first seven years which enabled the County to continue delivering necessary governmental services. (AR 19-20.)

Meanwhile, also in 2002, the California County of Sacramento sought guidance from HHS on the allowability of interest costs under Circular A-87 in the event Sacramento County refinanced its own previously-issued POBs. (AR 112.) In response to this inquiry, the Director of HHS' Division of Cost Allocation, Western Field Office, ("DCA") wrote a guidance letter as to the allowability of costs associated with refunding/refinanced POBs. This 2003 DCA letter was written by David S. Low, then DCA Western Field Office Director, and indicated the following in relevant part:

> While the 1994 policy statement did not discuss refinancing of the POBs, it is our opinion that if the aggregate cost of the refinanced POBs is less costly than the POBs that it replaces, the refinanced POBs would be acceptable under the 1994 policy statement. Conversely, if the aggregate cost of refinancing the POBs is more costly than the POBs it replaces, the excess cost would not be allowable. This interpretation is consistent with the 1994 policy that made the original POBs allowable if it accomplishes the same purpose at a lower cost.

(AR 30.)

**E.     The Dispute Between the Parties and Procedural History**

In October 2003, County representatives and representatives from the California State Controller's office met to discuss the allowability of costs pertaining to the County's 2002 POBs. (AR

6

31.)  On October 28, 2003, the DCA issued a letter to the County which provided the following, in relevant part:

> OMB Circular A-87 provides that interest on borrowed capital, however represented, is not allowable.  One exception was made by OMB in its 1994 policy interpretation on the premise that interest on the POB is a surrogate for the interest on the UAAL and is acceptable if it results in lower cost.  Once a POB is issued to replace the UAAL, the cost of the POB becomes the monetary benchmark.  Thus, if a POB is refinanced and results in greater cost, that additional cost is considered unallowable interest (i.e., not surrogate interest as in the original POB because there is no longer a UAAL).  Because of this, each POB must be viewed as a separate transaction and must be kept distinct to assure compliance with the lower cost requirement of the 1994 policy.  This was the basis of the DCA's clarification letter of February 13, 2003.
>
> The County had refinanced the 1998 POB with the 2002 POB, however, for a longer term and at a greater total cost.  The County had indicated that if it had known the additional cost would not be allowed, the County would not have gone through with the 2002 refinancing.  We indicated that we could not accept this as a basis to allow the excess cost.

(AR 31.)

Pursuant to the 2003 DCA letter that permitted costs of refinanced/refunding POBs to the extent they were not more costly than the POBs they were replacing, the costs associated with the County's 2002 POBs were not disallowed until they exceeded the 1998 POBs aggregate total which did not happen until 2015.

In February 2017, HHS' Cost Allocation Services ("CAS") division determined the County's POB costs for fiscal years 2015 and 2016 were unallowable under Circular A-87 and would not be reimbursed.  (AR 23-26.)  The basis for the denial was predicated on a comparison of the debt service costs on the 1998 POBs with the debt service costs on the 2002 POBs; HHS determined the 2002 POBs cost an additional $77,648,502 over the costs of the 1998 POBs.  (AR 24.)  HHS maintained its position that while the 1994 OMB guidance letter did not apply to refunding/refinanced POBs, if the aggregate cost of the refinanced POBs was less costly than the POBs they replace, the costs of the refinanced POBs would be allowable under the 2003 DCA letter.  However, if the aggregate cost of the POBs was more costly than the POBs they replace, the excess costs would not be allowable.  (AR 24.)  By fiscal year 2015, the County had incurred $260,559,687 in POB costs (principal plus interest) – the amount of the

1998 POBs total cost (principal and interest).  Once that threshold was reached, HHS determined no additional costs incurred on the 2002 POBs were allowable.

The County appealed this determination (AR 36) to HHS' Appeals Board.  The Appeals Board affirmed CAS' decision to disallow $6,271,287 the County claimed for FY 2015 and 2016 in pension costs.  (AR 1-18.)  The Appeals Board first determined neither Circular A-87 nor current existing regulations permit reimbursement for the cost of interest paid on borrowed capital.  As for the exception outlined in the 1994 OMB guidance letter, the Appeals Board found the exception is limited to POBs issued "to finance an unfunded pension liability."  Here, the County employee pension plan had no unfunded pension liability or UAL when the County issued the 2002 POBs because the prior 1998 POBs had completely eliminated the UAL; thus, the OMB 1994 guidance letter exception did not apply.

The Appeals Board also noted the policy basis for the 1994 OMB guidance letter exception was to reduce costs to the Federal Government.  To that end, the 1994 OMB guidance letter required that POBs not be "more costly to the Federal Government than regular pension financing." (AR 15.)  The County's 2002 POBs did not meet this requirement because the 2002 refunding/refinanced POBs "were [] more costly than the original UAL that had been financed by the 1998 POBs; total costs over the lifetime of the 2002 refunding POBs are $38,062,794 greater than the costs of the original UAL." (AR 15.)

As it pertained to the 2003 DCA letter, the Appeals Board determined it was not the basis for the denial of the County's 2002 POB costs; instead, the 2003 DCA letter expanded the ability to claim POB costs granted in the 1994 OMB guidance letter to refunded/refinanced POBs which did *not* fund UALs. According to the Appeals Board, the 2003 DCA letter did not create a new substantive rule or change the law defining allowable costs associated with pension plan costs. Rather, it created a new exception from the restrictions in Circular A-87 that was not encompassed by the 1994 OMB guidance letter exception.

For these reasons, the Appeals Board upheld CAS' denial of the County's 2015 and 2016 costs associated with the 2002 POBs.  The County challenges that determination and seeks judicial review

pursuant to the Administrative Procedures Act ("APA"), 5 U.S.C. § 702. It is this decision the County challenges before this Court.

### III. STANDARD OF DECISION

In an action brought pursuant to the APA, a reviewing court may "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "It is well established that once an agency has taken final agency action under the APA, a reviewing court analyzes that decision under the 'arbitrary and capricious' standard of review." *Mt. St. Helens Mining & Recovery Ltd. P'ship v. United States*, 384 F.3d 721, 727 (9th Cir. 2004) (citations omitted).

"Under the arbitrary and capricious standard, a reviewing court must determine whether an agency's decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Mt. St. Helens*, 384 F.3d at 728 (citation omitted). "This standard is narrow and [a reviewing court] may not substitute [its] judgment for that of the agency. Applying the arbitrary and capricious standard, [the] court must determine whether the agency articulated a rational connection between the facts and the choice made." *Id*. (citations omitted). "This standard of review is highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Ranchers Cattlemen Action Legal Fund v. U.S. Dep't of Agric.*, 499 F.3d 1108, 1115 (9th Cir. 2007) (quotations omitted). "In its paradigmatic statement of this standard, the Supreme Court explained that an agency violates the APA if it has 'relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Id*. (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).

Under the APA, the district court's review of an agency's decision is usually limited to the

administrative record. 5 U.S.C. § 706; *see also Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1011 (D.C. Cir. 1999) (when reviewing final agency action, the district court is not managing a "garden variety civil suit," but rather "sits as an appellate tribunal"). Therefore, the usual "genuine dispute of material fact" standard for summary judgment normally does not apply in an APA case. *San Joaquin River Group Auth. v. Nat'l Marine Fisheries Serv.*, 819 F. Supp. 2d 1077, 1083–84 (E.D. Cal. 2011). In other words, in the context of reviewing an administrative decision under the APA, there are normally no "disputed facts that the district court must resolve." *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769 (9th Cir. 1985). "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Id.; see also City & Cnty. of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir. 1997). "[S]ummary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did." *Occidental*, 753 F.2d at 770. Summary judgment is proper if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## IV. <u>ANALYSIS</u>

**A.      The Parties' Arguments**

       **1.      The County's Motion for Summary Judgment**

       The County argues the plain language of the 1994 OMB policy guidance makes clear that interest on POBs is an allowable cost as a surrogate for the original UAL amortization costs for which the County may properly seek reimbursement. Under the 1994 OMB guidance letter, the County contends the appropriate cap for any POB cost reimbursement – no matter how many times the original POBs may be refinanced through subsequent POBs – is the County's originally calculated UAL. Because the total cost of the 2002 Refunding POBs was less than the County's originally calculated UAL through Fiscal Year 2016, those costs are reimbursable. Rather than awarding this reimbursement, however, the County argues HHS disregarded the 1994 OBM guidance letter that made POB interest costs allowable and

10

substituted its own interpretation to disallow those costs. The County argues the Secretary rested this determination on (1) a conclusion that the County's UAL was extinguished in 1998 when the original POBs were issued, and (2) a new rule HHS implemented through the 2003 DCA letter that determined allowable interest on refinanced POBs is capped by the amount of costs associated with the initial POBs rather than the costs associated with the original UAL. According to the County, this new rule by HHS was not based on any statute or regulation but on an informal interpretation issued by HHS' DCA in 2003. This 2003 DCA letter, the County argues, is not based on statutory or regulatory authority, and it makes a material change to the 1994 OMB guidance letter by treating POBs and refunding POBs differently without any opportunity for public notice and comment. Moreover, maintains the County, even if the 2003 DCA letter is construed as an interpretive rule, it is not based on any underlying law.[6] HHS made substantive changes to the allowability of POB costs as nothing in the 2003 DCA letter "contains or explains a substantial justification for reversing the 1994 OMB interpretation authorizing reimbursement for interest on POBs." For this reason, the County argues the Secretary's reliance on the 2003 DCA letter to deny the County reimbursement for costs stemming from the 2002 POBs for the 2015 and 2016 fiscal years is arbitrary and capricious.

The County also argues the Secretary's interpretation of the 1994 OMB guidance letter is entitled to no deference because that interpretation is wrong: the 1994 OMB guidance letter should not be interpreted literally by limiting cost reimbursement only to POBs that replaced the original UAL, nor does the 1994 OMB guidance letter state that it is to be construed narrowly. According to the County, the 1994 OMB guidance letter expressly provided for reimbursement of interest on debt used to finance a UAL so long as it did not exceed regular pension financing. The Secretary's contrary interpretation of

---

[6] Under the APA, federal agencies must use "rule making" processes for any "rule" that constitutes a statement of general or particular applicability and future effect that is designed to implement, interpret, or prescribe law or policy. 5 U.S.C. § 551(4). This rule-making process is generally called "notice-and-comment rulemaking." 5 U.S.C. § 553. This notice-and-comment requirement "does not apply" to "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice." *Id.* at § 553(b)(A).

the 1994 OMB guidance letter is not entitled to any deference. Rather, the OMB's own 1994 guidance letter controls, and HHS' contrary interpretation of that guidance letter is not entitled to any kind of deference. Finally, the Secretary's decision to apply the 2003 DCA letter was an unauthorized retroactive application to POBs that issued in 2002.

###    2.    The Secretary's Motion for Summary Judgment

The Secretary maintains the Board's decision was supported by substantial evidence and correctly applied the relevant regulations and guidance. According to the Secretary, Circular A-87 provides that costs incurred for interest on borrowed capital, however represented, are unallowable. 2 C.F.R. § 200.449(a). While Circular A-87 provides exceptions for certain types of interest, those are inapplicable here. The 1994 OMB guidance letter creates only a limited exception to the general unallowability of interest on borrowed capital and sets out specific requirements that must be met before interest on POBs may be deemed allowable. The Secretary maintains the County's 2002 POBs do not meet those requirements.

First, the 1994 OMB guidance letter limits reimbursement to POBs issued "to finance an unfunded pension liability." (*See* AR 28.) The County's UAL was extinguished in 1998 when the 1998 POBs were made assets of the pension plan – as required by the 1994 OMB guidance letter. Because the 2002 POBs were issued to refinance the existing 1998 POBs rather than to finance a pension plan UAL, the 2002 POBs do not meet the threshold requirement for the exception outlined in 1994 OMB guidance letter. Second, the 2002 POBs do not meet the requirements of the 1994 OMB guidance letter because the 2002 POBs increased costs compared to the pension financing that was in place at the time the 2002 POBs were issued. The central reason for allowing reimbursement of these costs in the first place was to decrease costs to the Federal Government. The 2002 POBs here do not meet this requirement that any POBs decrease costs to the Federal Government as assessed at the time the POBs are issued. At the time the County financed the 2002 POBs, they were not only more expensive than the 1998 POBs, they were more expensive than the original UAL.

As for the County's argument that the 2003 DCA letter was illegitimate because of its lack of adherence to notice-and-comment rulemaking procedures and its alleged retroactive application, the Secretary maintains the Appeals Board correctly declined to address these arguments. According to the Secretary, the Appeals Board properly found the County's arguments were premised on the erroneous assumption the 2003 DCA letter articulated a more restrictive approach to interest stemming from refunding/refinancing POBs than the 1994 OMB guidance letter. According to the Secretary, because the disputed costs stemming from the 2002 POBs would not have been allowed even in the absence of the 2003 DCA letter, whether the 2003 DCA letter should have been adopted pursuant to notice-and-comment procedures under the APA is irrelevant to the resolution of this case. Nevertheless, even if this issue were considered, the Secretary maintains the record amply demonstrates the issuance of the 2003 DCA letter was proper: the 2003 DCA letter was issued pursuant to HHS' authority to interpret and apply Circular A-87 and the exception allowed by the 1994 OMB guidance letter. Circular A-87 has always unambiguously disallowed interest costs from financing and/or borrowed capital. The Secretary argues OMB exercised its discretion in 1994 to create a narrow exception for the allowability of costs associated with POBs. As the cognizant agency, HHS has the authority to interpret Circular A-87 along with the OMB 1994 guidance letter and make determinations about the allowability of pension financing costs. Circular A-87 was incorporated into HHS' regulations, and HHS' subsequent interpretation of those regulations is well within its authority to interpret its own regulations, and that interpretation is entitled to deference.

Moreover, the County's presumption the 1994 OMB guidance letter did not constitute substantive rulemaking subject to notice-and-comment requirements under the APA, but the 2003 DCA letter *was* substantive rulemaking subject to APA notice-and-comment requirements, is inconsistent. Further, the County has been enjoying the benefits of the exception outlined in the 2003 DCA letter since it began incurring costs on the 2002 POBs – under both the terms of Circular A-87 and the 1994 OMB guidance letter, the Secretary maintains *none* of the interest costs on the 2002 POBs would have been reimbursable:

under Circular A-87, the interests costs were incurred from borrowed capital; under the 1994 OMB guidance letter, the 2002 POBs did not pay off an existing UAL which had been completely extinguished in 1998, they simply refinanced the original POBs. However, under the 2003 DCA letter, to the extent the 2002 POBs incurred interest costs that were less than the 1998 POBs, it was considered reimbursable by HHS – something neither Circular A-87 nor the 1994 OMB guidance letter permitted. Until the County reached the cost threshold that would have been incurred on the 1998 POBs, the interest incurred on the 2002 POBs was allowable. When the costs of the 2002 POBs *exceeded* the costs of the 1998 POBs, those excess costs were not be allowable for reimbursement. Thus, in 2015 when the aggregate cost of the 2002 POBs surpassed what the aggregate costs of the 1998 POBs would have been, those excess costs were disallowed. According to the Secretary, even if the 2003 DCA letter were found to be an improper exercise of HHS' authority, the County's reimbursement requests would still be denied under the terms of Circular A-87 and the 1994 OMB guidance letter – in fact, none of the interests costs the County has been reimbursed since the 2002 POBs were issued would be allowed.

**B.      The Appeal Board's Disallowance of the County's Fiscal Year 2015 and 2016 Pension Costs Pursuant to Circular A-87 and the 1994 OMB Guidance Letter Is Legally Correct**

As an initial matter, the parties present various arguments regarding the deference the Court should or should not ascribe to HHS' interpretation of the 1994 OMB guidance letter – either as stated in the DCA 2003 letter or as the Appeals Board interpreted and applied the 1994 OMB guidance letter in its 2018 decision.

**1.      *Auer* Deference to the 1994 OMB Guidance Letter and Interpretations Thereof is Not Warranted**

The County maintains no deference should apply to HHS' interpretation of the 1994 OMB guidance letter because that 1994 letter is an interpretation of OMB's own regulation – *i.e.*, Circular A-87. According to the County, *Auer* deference cannot apply to an agency's interpretation of a different agency's interpretation of its own regulation. Moreover, the County contends the 1994 OMB guidance

14

letter is a policy interpretation of Circular A-87 and is itself entitled to *Auer* deference. (Doc. 25-1, 25:9-29:11.)

The Secretary responds there is no dispute as to OMB's authority to issue the 1994 OMB guidance letter, but *Auer* deference is inapposite because there is no ambiguity in the A-87 Circular to be interpreted by the 1994 OMB guidance letter. As for the 2003 DCA letter, the Secretary argues that letter is an interpretation of Circular A-87 that should be given deference as discussed by the courts in *State of New York v. Shalala*, 959 F. Supp. 614, 620 (S.D.N.Y 1997), *Alabama v. Shalala*, 124 F. Supp. 2d 1250, 1263 (M.D. Ala. 2000), and *Arizona v. Shalala*, 121 F. Supp. 2d 40, 53 (D.D.C. 2000). (Doc. 30, 5:24-9:4.)

Some agency determinations of law are entitled to heightened judicial deference. *Auer* deference, also referred to as *Seminole Rock* deference, calls for a court to defer to an agency's interpretation of its own ambiguous regulation unless that interpretation is "plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 464 (1997); *see Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945); *see also Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012). There are several situations where *Auer* deference may be withheld: when the agency's interpretation is plainly inconsistent with the regulation, when there is reason to suspect the agency's interpretation does not reflect the agency's fair and considered judgment on the matter in question, when the agency's interpretation conflicts with a prior interpretation, or when the agency's interpretation is nothing more than a "convenient litigating position." *Christopher*, 567 U.S. at 155 (citations omitted).

There is no basis to apply *Auer* deference to either the 1994 OMB guidance letter itself (as the County asserts) or to apply it to HHS' interpretation of the 1994 OMB guidance letter as stated in the Appeal Board's decision or the 2003 DCA letter. *Auer* deference involves an agency interpretation of its own *ambiguous* regulation. *Christensen v. Harris County*, 529 U.S. 576 588 (2000) ("*Auer* deference is warranted only when the language of the regulation is ambiguous . . . To defer to the agency's position [where the regulation is not ambiguous] would be to permit the agency, under the guise of interpreting a

regulation, to create *de facto* a new regulation.").  Assuming OMB Circular A-87 is an OMB "regulation"[7] and has been subject to notice-and-comment rulemaking procedures under the APA, *see, e.g.,* 60 Fed. Reg. 26484 (1995), there is no basis to conclude Circular A-87 is ambiguous such that it was subject to interpretation in the 1994 OMB guidance letter.

The 1981 version of Circular A-87 was in effect in 1994 when OMB issued its 1994 guidance letter.[8]  The 1981 Circular A-87, Attachment B, Section D.7 (Disallowable Costs) expressly prohibits interest on financing or refinancing as a reimburseable cost:

> 7.  Interest and other financial costs.  Interest on borrowings (however represented), bond discounts, cost of financing and refinancing operations, and legal and professional fees paid in connection therewith, are unallowable except when authorized by Federal legislation and except as provided for in paragraph C.2.a[9] of this Attachment.

Traditionally, cognizant federal agencies had not considered the "interest" on amortized UALs to be precluded under this section because that "interest" did not stem from "borrowings" or "financing" – it was an actuarial calculation of the cost of funding a UAL over time.  (*See* AR 27 (1994 OMB guidance letter).)  Rather, payments on a pension fund's UAL and the costs of amortization were considered reimburseable under Attachment B, Section B.13.b (allowable costs) as the costs stemming from pension plans:

> Employee benefits in the form of employers' contribution or expenses for social security, employees' life and health insurance plans, unemployment insurance coverage, workmen's compensation insurance, pension plans, severance pay, and the like, provided such benefits are granted under approved plans and are distributed equitably to grant programs and to other activities.

---

[7] "In carrying out its responsibilities, the Office of Management and Budget issues policy guidelines to Federal agencies to promote efficiency and uniformity in Government activities.  These guidelines are normally in the form of circulars."  5 C.F.R. § 1310.1.  The circulars issued by OMB cover a variety of topics related to the administration of federal programs.  5 C.F.R. § 1310.5; *see also* 31 U.S.C. § 503(a) (Deputy Director of Management shall establish governmentwide financial management policies for executive agencies and shall provide overall direction and leadership to the executive branch on financial management matters by establishing financial management policies and requirements).

[8] The 1981 version of Circular A-87 was in the process of revision in 1994, and it was reissued in 1995 after notice-and-comment procedures.  60 Fed. Reg. 26484 (1995).

[9] Section C.2.a relates to financing for building space and is inapplicable to bond interest costs.

(AR 211, Circular A-87, Attachment B.)

The issuance of POBs is "financing" and the interest costs stemming therefrom are clearly prohibited by Circular A-87, Attachment B, Section D.7. As the Secretary notes, *Auer* deference is applicable only where the regulation interpreted is ambiguous; if an agency regulation is not ambiguous, a court is to forego deference and apply the plain language of the regulation as written. *Christiansen*, 529 U.S. at 588. Circular A-87's preclusion on interest as an allowable cost is not ambiguous, so any contrary "interpretation" of that plain language would not be subject to *Auer* deference.[10]

Circular A-87's terms, however, allow OMB to make exceptions to the Circular's provisions. Circular A-87, 46 Fed. Reg. 9548-01 (1981) ("applicability and scope" section of Circular A-87 indicates that "[a]ny other exceptions will be approved by the [OMB] in particular cases where adequate justification is presented"); *see also* 2 C.F.R. § 200.102(a) (2014) ("OMB may allow exceptions for . . . non-Federal entities subject to the requirements of this part when exceptions are not prohibited by statute"). While the 1994 OMB guidance letter does not cite this exception power as authority for issuing the 1994 letter, OMB has the power to make exceptions to the cost principles set out in Circular A-87, 46 Fed. Reg. 9548-01 (1981); 2 C.F.R. § 200.102(a) (2014), and as Circular A-87 is not a statute, carving out exceptions from its prohibitions is permitted. The exception articulated in the 1994 OMB guidance letter permits POB costs to be considered an allowable pension cost under Circular A-87, Attachment B, Section B.13.b, with a policy goal of reducing costs to the Federal Government. Whatever deference may be owed to OMB's exception to Circular A-87 articulated in the 1994 OMB guidance letter, it is not deference arising under *Auer*.

Turning to HHS' *interpretation* of the 1994 OMB guidance letter (as stated in the 2003 DCA letter and in the Appeals Board's 2018 decision), the County argues no deference to that interpretation under

---

[10] This applies in equal measure to the 2003 DCA letter to the extent it is characterized as an interpretation of an ambiguity in Circular A-87.

*Auer* can be afforded because it is an interpretation by HHS of an interpretation by OMB of OMB's Circular. (Doc. 25-1, 25:10-:29:10) ("No deference is due to the Secretary's position that the Refunding POBs are somehow outside the scope of the 1994 policy interpretation" . . . "no deference is due the Secretary's final decision disallowing the Refunding POB interest costs that were below the UAL cap" . . . "the Secretary was not interpreting his own regulations, but was attempting to revise OMB's uniform rules that apply to multiple federal agencies").

*Auer* deference is simply not relevant to HHS' interpretation of the 1994 OMB guidance letter. First, there is no ambiguity in Circular A-87 for the 1994 OMB guidance letter to interpret; the 1994 OMB guidance letter created an exception, it did not offer an interpretation. Second, even if it were characterized as an interpretation, HHS would have been interpreting OMB guidance that in turn purportedly interpreted a regulation. There is no authority for the proposition that any subsequent interpretation – even by OMB itself – of the 1994 OMB letter guidance interpreting Circular A-87 could be afforded deference let alone that deference could be afforded to *another* agency's interpretation of OMB's 1994 letter guidance interpreting Circular A-87. Even assuming there were ambiguities to be interpreted, which there are not, application of deference in these circumstances would be something along the lines of *Auer* "squared deference," *see Elgin Nursing & Rehab. Center v. U.S. Dept. of Health & Human Resources*, 718 F.3d 488, 493 (5th Cir. 2013),[11] but also once removed (agency's interpretation of a *different* agency's interpretation of a regulation), which is a completely unrecognizable extension of *Auer*.

Ultimately, however, it is irrelevant whether some level of deference to the 1994 OMB guidance letter or HHS' interpretation of that letter is appropriate: for all the reasons discussed below, even

---

[11] *Id.* ("All of our decisions applying [*Bowles v. Seminole Rock & Sand Co*., 325 U.S. 410, 414 (1945)] and *Auer*, however, have addressed only an agency's direct interpretation of its published regulations. DHHS, it seems, asks us to go a step further and defer to its interpretation of the SOM; essentially, it seeks '*Seminole Rock* squared' deference—deferring to its interpretation of its manual interpreting its interpretive regulation. We have never granted such extraordinary deference to an agency, and we decline to do so now.").

considered de novo, the 1994 OMB guidance letter unambiguously does not encompass refinanced/refunded POBs, and HHS' application of the 1994 OMB guidance letter to that effect is reasonable, persuasive, and legally correct. Because application of the 1994 OMB guidance letter is dispositive to the issues presented, the Court turns now to the exception for POB interest created by OMB in 1994.

### 2. The Plain Language of the 1994 OMB Guidance Letter Exception Does Not Encompass the County's 2002 Refinanced/Refunded POBs

The parties' primary dispute centers on whether the 1994 OMB guidance letter encompasses refunding/refinanced POBs – specifically, the County's 2002 POBs. The parties each claim the plain language of the 1994 OMB guidance letter unambiguously supports their respective positions, which stand in stark contrast. The County argues the 1994 OMB guidance letter unambiguously encompasses refinanced POBs as allowable under Circular A-87. (*See* Doc. 25-1, 24:5-25:7 ("The County's claims to be reimbursed in full for its 2002 Refunding POB costs for Fiscal Years 2015 and 2016 are supported by the plain language of OMB Circular A-87, as interpreted by OMB in its 1994 policy interpretation that made the interest on all POBs allowable up to the limit of the County's UAL.").) The Secretary contends the 1994 OMB guidance letter unambiguously indicates *refinanced* POBs were never contemplated by the OMB in 1994 as an exception for interest on borrowed capital; the Secretary maintains the Appeals Board correctly applied the OMB 1994 guidance letter exception and denied the County's claims for reimbursement of pension costs in fiscal years 2015 and 2016.

### a. The 1994 OMB Guidance Letter Exception Pertains Only to Bond Financing that "Funds an Unfunded Actuarial Liability"

The 1994 OMB guidance letter considered state and local government's contention made to HHS that interest on debt issued to fund an unfunded liability should be allowable under Circular A-87 if this financing mechanism reduced costs to the Federal Government. (AR 27.) The OMB found that interest on bonds issued to finance a UAL was a surrogate for the actuarially-calculated "interest" on amortized

UALs and would be "allowable under paragraph B.13.b of Circular A-87 [Attachment B], if the following criteria are met:"

1.  Debt financing of the unfunded actuarial liability (UAL) is not more costly to the Federal Government than regular pension financing over the remaining unamortized life of the UAL, considering bond principal, interest, issuance costs, and any other relevant factors, as determined at the time of financing.  If this criterion is not met, interest on debt issued to finance the UAL will be allowed only to the extent of the regular pension financing.

2.  All net bond proceeds are made part of pension fund assets.

3.  The funding for bond principal and interest is (a) included in each period's pension requirement (e.g., annual, biennial, or other), (b) computed in the same manner as the actuary's amortization of the UAL at the time of the conversion to debt financing, and (c) calculated using the weighted average interest rate on the bonds for the period in place of the actuarially-assumed interest rate  . . . .

(AR 27-28.)

Employing the canons of statutory and regulatory construction as interpretive tools here, the 1994 OMB guidance letter squarely and unambiguously relates only to the original financing/funding of a UAL through pension bonds, not subsequent refinancing or refunding of another POB.  First, the 1994 OMB guidance letter was issued in response to HHS' very specific question about the costs associated with pension bonds that fund an unfunded pension liability, not about bond financing that *either* funds an unfunded pension liability *or* refinances a previously issued POBs.  *See Robinson v. Shell Oil Co.*, 519 U.S 337, 341 (1997) (courts look to "the specific context in which that language is used, and the broader context of the statute as a whole").  As expressly noted in the 1994 OMB guidance letter, HHS indicated to OMB that HHS and other federal agencies had interpreted Circular A-87 to allow reimbursement of actuarially-calculated interest on UALs (regular pension funding).[12]  State and local governments had argued to HHS that since actuarially-calculated "interest" on the UAL had been allowed

---

[12] The reasoning for this seems to be that actuarially-calculated interest to fund pension UALs was not considered by federal agencies to be a product of "financing" or borrowed capital; it was a calculation of the amortization required for catch-up payments on an underfunded pension fund.

20

as a reimburseable cost under A-87, interest from debt financing issued to fund the UAL should be allowable if this financing mechanism reduces costs to the Federal government. (AR 27.) The question posed to OMB did not relate to *any/every* type of financing pertaining in some tangential way to a UAL payoff – it very specifically encompassed *only* "bonds issued to finance an unfunded pension liability." (AR 27.) The answer provided in the 1994 OMB guidance letter was tailored to the express and specific situation posed by HHS' question.

Second, the language of OMB's answer to HHS' question on this issue, as set out in the 1994 guidance letter, very clearly addressed only the initial issuance of POBs to fund an existing UAL. To make an exception for interest (financing costs) on POBs as a reimburseable cost not precluded by Circular A-87, Attachment B, Section D.7, OMB required that "[d]ebt financing of the unfunded actuarial liability (UAL) is not more costly to the Federal Government than regular pension financing . . . " and required that "[a]ll net bond proceeds [be] made part of pension fund assets." Where initial POBs are issued to fund a UAL, the UAL is paid off because the net POB proceeds are made part of the pension fund assets. This is like obtaining a mortgage to pay the contract purchase price to the seller of a home. Once the seller is paid by money issued from the mortgagor, the sales contract on the house is satisfied – any subsequent refinancing of the mortgage no longer involves the sales contract or the seller. In the same way, once the pension bond proceeds are made part of the pension assets, the UAL is extinguished. GASB standards make this clear: a UAL is calculated by taking the excess of the Actuarial Accrued Liability over the Actuarial Value of Assets. Once POBs funding the entire UAL are added to the assets of the pension plan, any shortfall in the Actuarial Value of Assets compared to the Actuarial Accrued Liability is alleviated, and from an accounting standpoint, the UAL ceases to exist. (AR 628 (GASB No. 27, 40(A-5), (A-6).) When the 1994 OMB guidance letter specifically and repeatedly references debt financing used to fund a UAL, it is clear it is *not* discussing debt financing that occurs *after* the UAL has been extinguished. OMB's exception deals only with POBs used to pay/fund a UAL – once that UAL has been funded, no subsequent refinancing will be used to fund that UAL any more than a refinanced

mortgage will be used to satisfy the original sales contract.  In the context of the specific question raised and the language OMB used to set criteria for the exception for the allowability of POB interest costs, the exception only encompasses POB issuances that pay off an existing UAL – in full or in part.

The County maintains the OMB guidance letter states the interest on bonds to finance a UAL is a "surrogate" for the actuarially-determined interest on the UAL (AR 27).  According to the County, both original and refinanced POBs stand in the shoes of the actuarially-calculated UAL interest as a surrogate.  The County contends that to interpret the 1994 letter as only applicable to original POBs creates a distinction for different types of bond financing that OMB never intended:  any type of bond financing *relating to* the underlying UAL acts as a surrogate for the actuarially-calculated UAL interest.

The County's focus on the term "surrogate" in the 1994 OMB guidance letter and the argument that original and refinanced/refunded POBs are both surrogates in equal measure for the actuarially-calculated interest on the UAL ignores the express requirements of the exception set out in the 1994 OMB guidance letter.  Despite that the County maintains refinancing/refunding POBs were a well-established practice at the time the 1994 OMB guidance letter was issued, the requirements set out in the guidance letter are not broadly worded and do not refer to *any* bond financing that acts as a "surrogate."  Rather, the criteria expressly refer to "financing of the [UAL]" and require that all net bond proceeds become part of the pension fund assets, which in turn extinguishes the UAL or portion thereof it was intended to fund.  A refinanced/refunded POB does not finance a UAL that has already been extinguished by an original POB.  If refinanced/refunded POBs had been contemplated by OMB in the 1994 guidance letter, the wording of the criteria for the exception would not have referenced financing a UAL and paying it off by making all net bond proceeds part of the pension fund assets.  The County points to no evidence in the record that the 2002 POB proceeds were made part of the pension fund assets or that any portion of the UAL remained unpaid in 1998 when the first POBs were issued.

In a similar vein, the County also argues if the original 1998 POBs extinguished the UAL, then a "government entity such as the County could never claim any POB interest as a reimburseable expense

[which] would render the 1994 policy interpretation a nullity." (Doc. 27, 7:4, n.1.) As the Court understands it, this argument apparently assumes that if the UAL is extinguished when it is first funded with POBs, the interest paid on the POBs no longer serves as a surrogate for the amortization costs on the UAL which are not considered a product of borrowing or financing, and thus not in contravention of Circular A-87's prohibition on interest as an allowable cost. However, the authority to carve out an exception for POB interest that replaces UAL amortization costs was not predicated on creating a fiction that the UAL somehow still existed so that the interest on the POBs could be allowable as a surrogate for UAL amortization costs. Circular A-87 allowed OMB to make exceptions, and POB interest as an allowable pension cost is an exception. 46 Fed. Reg. 9548-01 (1981), ¶ 5 (Applicability and scope) (allowing OMB to make other exceptions to the application of the Circular's provisions); 2 C.F.R. § 200.102(a) (2014). In other words, it is not this concept of serving as a "surrogate" that made POB interest allowable. POB interest is considered a surrogate for UAL amortization costs *and* allowable only *if* it meets the criteria outlined by the 1994 OMB guidance letter, the first two of which included financing a UAL and then paying the UAL off by making the POB proceeds part of the pension fund assets. (AR 27 ("interest on bonds issued to finance [a UAL] is a surrogate for interest on the [UAL] . . . [and] is allowable . . . if the following criteria are met: . . . ").) A refunded POB cannot accomplish those requirements no matter whether the interest thereon still could be considered a "surrogate" in a figurative sense for the original UAL amortization costs.

### b. The County's 2002 POBs Were More Costly to the Federal Government than the Regular Pension Financing

As identified by the 1994 OMB guidance letter, the only reason to except POBs from Circular A-87's prohibition on financing costs and consider them a surrogate for actuarially-calculated "interest" on a UAL is "if the debt financing mechanism reduces cost to the Federal Government." (AR 27.) To that end, the first of the three requirements set out in the 1994 OMB guidance letter mandates that debt financing not be more costly to the Federal Government than regular pension financing "*as determined*

*at the time of financing*":

> Debt financing of the unfunded actuarial liability (UAL) is not more costly to the Federal Government than regular pension financing over the remaining unamortized life of the UAL, considering bond principal, interest, issuance costs, and any other relevant factors, as determined at the time of financing. If this criterion is not met, interest on debt issued to finance the UAL will be allowed only to the extent of the regular pension financing.

(AR 28.) The final sentence of this requirement contains a proviso that, in context, is a backstop if the cost of debt financing *after* the time of financing *ultimately* becomes more expensive than the cost of regular pension financing it had replaced; in that case, only interest costs up to the costs of regular pension financing will be reimburseable. This proviso cannot be read to mean that if debt financing is more expensive than regular pension financing as calculated *at the time of financing*, interest on that debt financing may be allowed to the extent of regular pension financing. That interpretation creates an absurd result by countering the express purpose of the exception for POB interest (reducing costs to the Federal Government) and vitiates the first criteria for the exception requiring that debt financing of the UAL *not* be more costly than regular pension financing *as determined at the time of financing*. In other words, if a pension bond issuance is calculated to be more expensive than regular pension financing at the time of financing, the 1994 OMB guidance letter's express requirements for the exception are not met and the interest costs associated with that bond issuance are not allowable.

Thus, even if the 1994 OMB guidance letter encompassed refinanced/refunded POBs despite the guidance letter's repeated references to funding a UAL and replacing regular pension financing which refinanced POBs could not accomplish, the County's 2002 POBs would *still* not qualify for the exception: at the time of financing in 2002, the total cost and principle of the 2002 refinanced POBs was $338,208,189 compared to the original UAL total of $300,145,395. There is nothing in the record indicating the 2002 POBs were not more costly than the original UAL at the time they were financed in 2002. Moreover, as discussed above, the proviso cannot be interpreted to mean that if POBs are more costly than the UAL as determined at the time of financing, they still could be reimbursed up to the total of the original UAL (principal and amortization costs). The County's 2002 POBs could not be reimbursed

24

up to the original UAL cost benchmark because, at the time of financing in 2002, those 2002 POBs were already known to be more costly than the original UAL.[13]  The 2002 POBs do not qualify for the 1994 OMB guidance letter exception, and they do not achieve any cost savings to the Federal Government which the exception was designed to create.

### 3. The Appeals Board's Application of the 1994 OMB Guidance Letter is Supported by Substantial Evidence

The Appeals Board correctly determined the 1994 OMB guidance letter exception pertained only to POBs issued to eliminate the unfunded liabilities of employee pension funds.  (AR 13-15.)  The Appeals Board found that when the County issued its refinanced/refunded POBs in 2002, there was no underlying UAL to pay off – it had already been extinguished in 1998.  This is supported by GASB accounting principles explaining how a UAL is calculated.  (AR 628, No. 27, (A-6).)  As discussed above, GASB accounting principles define an Actuarial Value of Assets as "[t]he value of cash, investments and other property belonging to a pension plan, as used by the actuary for the purpose of an Actuarial Valuation."  (*Id.*)  A UAL, in turn, is defined under GASB principles as "The excess of the Actuarial Accrued Liability over the actuarial Value of Assets."  Under these principles, once the 1998 POBs were made part of the net assets of the pension plan, the excess of the Actuarial Accrued Liability over the Actuarial Value of Assets would have shown the UAL existing before the 1998 POB issuance was eliminated.  As the UAL was extinguished, the 2002 POBs could not be considered "debt financing of the unfunded actuarial liability" as described in the 1994 OMB guidance letter.

The Appeals Board also correctly concluded the County's 2002 POBs were inconsistent with the purpose of the 1994 OMB guidance letter because the 2002 POBs were more costly than both the original amortized UAL and the 1998 POBs.  The evidence in the record supports this finding.  (*See* AR 32.)  The

---

[13] And, at the time of financing the 2002 POBs, the existing debt structure was the 1998 POBs, which were approximately $77 million less costly than the 2002 POBs.  (*See* AR 32.)  No matter what benchmark the 2002 POBs are measured against, they were more expensive than *any* previous financing at the time they were issued.

total UAL in March 1998 was $300,145,395; the 1998 POBs principle and costs totaled $260,559,687. The 2002 POBs principle and costs were $338,208,198. (AR 32.) The 2002 POBs were over $77 million more costly than the 1998 POBs and over $38 million more costly than the original UAL – by either benchmark, the 2002 POBs were more costly. As such, the 2002 POBs did not meet either the express requirement of the 1994 OMB guidance letter that debt financing not be more costly than regular pension financing or the underlying policy basis on which the OMB 1994 exception rested: reducing costs to the Federal Government.

### 4. The 2003 DCA Letter

The County argues the Appeals Board disregarded the OMB's 1994 guidance letter "that made the POB interest costs allowable costs and substituted its own interpretation to disallow those costs." (Doc. 25-1, 15:27-16:1.) According to the County, the Appeals Board based its decision on an informal interpretation issued in the 2003 DCA letter: the 2003 DCA letter "made a material change in the 1994 OMB policy interpretation by treating POBs and Refunding POBs differently without any opportunity for public notice and comment, nor is there any indication that the changes made by the DCA letter would be published in the Federal Register or the Code of Federal Regulations." (Doc. 25-1, 17:25-18:1.) The County maintains the 2003 DCA letter constitutes a substantive change in the law (by distinguishing between POBs and Refunding POBs and treats them differently for reimbursement purposes), but HHS failed to comply with the fundamental procedures for issuing a legislative rule – notice-and-comment requirements pursuant to the APA. The County also maintains the 2003 DCA letter had impermissible retroactive effect on the 2002 POBs.

The Secretary contends the 2003 DCA letter is essentially irrelevant to the disallowance of the County's 2015 and 2016 fiscal year costs. According to the Secretary, neither Circular A-87 nor the 1994 OMB guidance letter provided any reimbursement for the County's 2002 POBs; thus, the 2003 DCA letter did not articulate a more restrictive approach to allowing costs related to refunding/refinanced POBs than the 1994 OMB guidance letter. The 1994 OMB guidance letter, by its terms, did not apply to

refunding/refinanced POBs.  The only way *any* costs pertaining to County's 2002 POBs could be reimbursed was if there was an *additional* exception.  The Secretary maintains HHS created such an exception through the issuance of the 2003 DCA letter, which was a proper exercise of HHS' authority to interpret Circular A-87 and make determinations about allowable costs.

The Appeals Board concluded the 2003 DCA letter provided no basis to reverse or lower the disallowance of the County's 2002 refunding/refinancing POB costs:

> . . . the 1994 OMB Letter was a narrow, limited exception to those cost principles that, as such, did not provide blanket authority to claim interest costs of all POBs. As such, the 2003 DCA Letter expanded the ability to claim POB costs granted in the 1994 OMB Letter by permitting types of POBs not addressed in that document and continuing its requirement that bond issuance not increase pension costs claimed for federal funding. Thus, the 2003 DCA Letter did not 'create a new substantive rule' or 'change[] the law defining allowable costs association with pension plan costs' or 'establish a standard that goes beyond the statute, HHS' cost allocation regulations, and even beyond the 1994 OMB [Letter]," as Fresno maintains . . . .

(AR 17.)

As discussed at length above, the Appeals Board correctly determined Circular A-87 unambiguously disallowed interest costs stemming from POBs; further, the Appeals Board correctly determined the 1994 OMB guidance letter created an exception to Circular A-87 that was unambiguously limited to POBs that funded an existing UAL, not refunding/refinanced POBs that funded existing POBs. The 2003 DCA letter was not the basis of the Appeals Board's refusal to allow costs association with the County's 2002 POBs.  Also, because the County's 2002 POB costs were not reimburseable under Circular A-87 or the 1994 OMB guidance letter, the 2003 DCA letter was not a more restrictive cost allowance policy.  As the Appeals Board correctly determined, there is no reason to consider whether the 2003 DCA letter was an improper exercise of HHS' authority:  even if it were, the County's 2002 POBs costs for FY 2015 and 2016 would remain disallowed.  Thus, the Court declines to consider whether the 2003 DCA letter was a proper exercise of HHS' authority.

**5.      Conclusion**

In sum, the Appeals Board's December 28, 2017, decision is supported by substantial evidence, its findings are not arbitrary or capricious, and its interpretation and application of Circular A-87 and the 1994 OMB guidance letter is persuasive and legally correct.

### V. <u>CONCLUSION AND ORDER</u>

For the reasons set forth above, IT IS HEREBY ORDERED that:

1.      The Appeals Board's December 28, 2017, decision is supported by substantial evidence and is not arbitrary or capricious;

2.      The County's motion for summary judgment is DENIED;

3.      The Secretary's motion for summary judgment is GRANTED; and

4.       The Clerk of Court is DIRECTED to enter judgment for the Secretary and this case shall be closed.

IT IS SO ORDERED.

Dated:   __April 30, 2019__                    _____/s/ Lawrence J. O'Neill_____
                                                                    UNITED STATES CHIEF DISTRICT JUDGE